UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 24-CV-23649-BLOOM/Elfenbein

**BOOM FUNDED, LLC**,

Plaintiff,

v.

**AEVA, LLC**, *et al.*,

Defendants.

_____/

## OMNIBUS REPORT AND RECOMMENDATION ON
## PLAINTIFF'S MOTIONS FOR SANCTIONS AND CIVIL CONTEMPT

**THIS CAUSE** is before the Court on four motions by Plaintiff Boom Funded, LLC. Two of them are Motions for Civil Contempt — one against Defendant Aeva, LLC ("Aeva"), ECF No. [78], and one against Defendant Barbara Deinet ("Deinet"), ECF No. [79] — for violating the Court's orders by failing to pay monetary sanctions awarded to Plaintiff under Federal Rule of Civil Procedure 37(a)(5)(A) ("Motions for Civil Contempt"). *See* ECF No. [32]; ECF No. [58]; Fed. R. Civ. P. 37(a)(5)(A), (b)(2)(A)(vii). The other two are Oral Motions Plaintiff made during discovery hearings requesting more severe sanctions against each Defendant under Rule 37(b)(2)(A); specifically, Plaintiff requests that the Court strike Defendants' pleadings and enter default judgment against them ("Motion to Strike and/or Motion for Default"). *See* ECF No. [80]; ECF No. [81]; Fed. R. Civ. P. 37(b)(2)(A)(iii), (vi). For the reasons explained below, I respectfully **RECOMMEND** that all four Motions, **ECF No. [78], ECF No. [79], ECF No. [80],** and **ECF No. [81]**, be **GRANTED**.[1]

_____

[1] The Honorable Beth Bloom referred "all discovery matters" to me. *See* ECF No. [12]. Because discovery motions are within the scope of that referral, I usually resolve them with an Order, not a Report and Recommendation ("R&R"). *See, e.g.*, ECF No. [32]; ECF No. [58]. This includes motions for Rule 37

## I.    BACKGROUND

This lawsuit arises out of a business relationship between Plaintiff and Defendants.  *See* ECF No. [1].  In May 2024, Plaintiff and Defendant Aeva entered into "a future receivables sale and purchase agreement" for "business financing" (the "Agreement").  *See* ECF No. [1] at 2; ECF No. [1-2].  In the Agreement, Plaintiff paid $150,000 to Aeva in exchange for a later payment of $204,000 from Aeva, which Plaintiff would receive as a specific percentage of Aeva's "future receipts."  *See* ECF No. [1] at 2.  Procedurally, the Parties intended the repayment to occur by Aeva "depositing 6% of its daily" future receipts "into a designated deposit account, from which Plaintiff" was "authorized to ACH debit a weekly payment" of $5,100 until Plaintiff recovered the full $204,000.  *See* ECF No. [1] at 2–3.  At the same time, Defendant Deinet signed a "Personal Guaranty of Performance" through which she "irrevocably, absolutely and unconditionally guarantee[d]" to Plaintiff the "prompt and complete performance of all" Aeva's "obligations" under the Agreement.  *See* ECF No. [1-2] at 17–20; ECF No. [1] at 3.

In September 2024, Plaintiff filed this lawsuit asserting two claims: breach of contract against both Defendants and breach of guaranty agreement against Deinet only.  *See* ECF No. [1] at 5–7.  Less than two months later, prompted by Defendants' insufficient and absent responses to early discovery requests, *see* ECF No. [24], Plaintiff requested the first of several discovery hearings, *see* ECF No. [23].  Since then, the Parties have been regular visitors to the Court for assistance resolving discovery disputes and related sanctions motions.  *See* ECF No. [23]; ECF

---

sanctions.  *See, e.g.*, ECF No. [38]; ECF No. [58]. Despite asking for Rule 37 sanctions, however, the discovery motions here are different than typical discovery motions because they may be case dispositive.  *See* Fed. R. Civ. P. 37(b)(2)(A)(iii) (allowing courts to "strik[e] pleadings in whole or in part" if a party "fails to obey an order to provide or permit discovery"); Fed. R. Civ. P. 37(b)(2)(A)(vi) (allowing courts to "render[] a default judgment against the disobedient party" if it "fails to obey an order to provide or permit discovery").  Absent consent of the Parties, under 28 U.S.C. § 636, I resolve case-dispositive motions like these by issuing an R&R.  *See* § 636(b)(1)(B); S.D. Fla. L. Mag. R. 1(d).

No. [36]; ECF No. [59]; ECF No. [74]. The Court has issued several Orders ruling on those disputes and motions, *see* ECF No. [32]; ECF No. [38]; ECF No. [58], but, for context, recaps them here.

### A.  First Discovery Hearing (December 16, 2024)

The first discovery hearing occurred on December 16, 2024 (the "First Discovery Hearing"), and problems arose immediately: defense counsel did not attend, despite having agreed to the date and time and despite the Court's efforts to reach him.[2] *See* ECF No. [32] at 1 & n.1. During the First Discovery Hearing, Plaintiff sought to compel both Defendants to produce better responses to Plaintiff's Requests for Admission ("RFAs"), *see* ECF No. [32] at 3–5, and sought to compel Defendant Aeva to respond to Plaintiff's Requests for Production ("RFPs") and Interrogatories, which were then thirty days overdue, *see* ECF No. [32] at 5–7. The Court overruled Defendants' written objections to Plaintiff's RFAs, deemed waived any substantive objections Defendant Aeva might have had to Plaintiff's RFPs and Interrogatories, granted both motions to compel, and required that Defendants produce all outstanding discovery and supplemental responses by December 31, 2024. *See* ECF No. [32] at 3–7.

Because the Court granted Plaintiff all the relief it sought during the First Discovery Hearing, the Court also granted Plaintiff's motion for Rule 37 monetary sanctions against Defendant Aeva. *See* ECF No. [32] at 7–9. After explaining that Rule 37 "is mandatory, not permissive, so the Court is required to grant the movant its reasonable expenses unless one of three exceptions applies," the Court found that none did. *See* ECF No. [32] at 7–9. But the Court went further than concluding that Plaintiff had attempted in good faith to obtain the discovery without

---

[2] As explained below, problems arose even before the First Discovery Hearing, as the Court had to order defense counsel to confer with Plaintiff's counsel to provide dates on which they were mutually available for the hearing.

court action, Defendant Aeva's nondisclosures and incomplete responses were not substantially justified, and no other circumstances made an award of expenses unjust. *See* ECF No. [32] at 7–9; Fed. R. Civ. P. 37(a)(5)(A).

Indeed, the Court also catalogued how Defendant Aeva made the discovery process difficult up to that point, including: (1) failing to respond to six different communications when Plaintiff tried to resolve the discovery disputes informally; (2) having to be ordered to comply with its meet-and-confer obligation before the First Discovery Hearing; (3) "completely ignor[ing] two sets of discovery requests"; and (4) failing "to show up for a discovery hearing that occurred at a mutually agreed upon date and time." *See* ECF No. [32] at 8. Simply put, Defendant Aeva had "proven to be consistently nonresponsive." *See* ECF No. [32] at 8. So the Court awarded Plaintiff Rule 37 monetary sanctions of $2,557.50 in attorney's fees, which is the amount it reasonably incurred to procure the improperly withheld discovery.[3] *See* ECF No. [32] at 9; ECF No. [38].

### B. Second Discovery Hearing (January 24, 2025)

About five weeks after the First Discovery Hearing, the Court held a second one. *See* ECF No. [36]; ECF No. [39]. The second discovery hearing occurred on January 24, 2025 (the "Second Discovery Hearing"), *see* ECF No. [39], and required the Court to revisit three discovery disputes addressed at the First Discovery Hearing, *see* ECF No. [37] at 1–2. Specifically, because Defendant Aeva "completely failed to respond to" Plaintiff's RFPs and Interrogatories despite the Court having "unambiguously" ordered it to do so by December 31, Plaintiff again asked the Court to compel Aeva's RFP and Interrogatory responses. *See* ECF No. [37] at 1. Similarly, Plaintiff once again asked the Court to evaluate the sufficiency of both Defendants' responses to some of its RFAs. *See* ECF No. [37] at 1–2. Plaintiff argued that, because both Defendants had "three

---

[3] The Court ordered Defendant Aeva to pay this first sanction award by February 23, 2025. *See* ECF No. [38] at 9. But as will be explained below, it did not.

chances to respond adequately and still" had "not done so," the Court should either deem the inadequate RFA responses "admitted under Rule 36(a)(6)" or, at minimum, again compel Defendants to provide better RFA responses.  *See* ECF No. [58] at 4–7.

Along with those three repeated discovery disputes, at the Second Discovery Hearing, Plaintiff also argued that, like Defendant Aeva, Defendant Deinet had "completely failed to respond to" Plaintiff's RFPs and Interrogatories.  *See* ECF No. [37] at 1–2.  Because Deinet's response deadline had elapsed, Plaintiff asked the Court to compel her RFP and Interrogatory responses as well.[4]  *See* ECF No. [37] at 1–2.  Finally, Plaintiff asked the Court to award monetary sanctions against both Defendants under Rule 37 because Plaintiff was forced to move to compel discovery responses for the second time.  *See* ECF No. [56]; ECF No. [57]; ECF No. [58] at 2, 7–8.  Plaintiff also asked the Court for stronger sanctions against Defendant Aeva — to strike its pleadings and enter default judgement against it — because its failure to provide documents and proper responses after the First Discovery Hearing was not only a failure to cure discovery deficiencies but also a violation of the Court's discovery order.  *See* ECF No. [56]; ECF No. [58] at 7.

The Court granted all of Plaintiff's substantive motions.  *See* ECF No. [58] at 1–7.  Because neither Defendant responded to Plaintiff's RFPs and Interrogatories, the Court ordered them both to do so — Defendant Aeva for the second time.  *See* ECF No. [58] at 3–4.  The Court also deemed waived under Rule 36(a)(6) any substantive objections either Defendant may have had to Plaintiff's RFPs and Interrogatories, as their responses were "already more than 30 days past due." *See* ECF No. [58] at 3 n.1, 4 n.2.  As to Plaintiff's RFAs, the Court deemed most of them admitted

---

[4] Although the Court addressed Plaintiff's Requests for Admission to Defendant Deinet at the First Discovery Hearing, *see* ECF No. [32] at 5–7, it did not address Plaintiff's Requests for Production and Interrogatories to her, *see generally* ECF No. [32].  For that reason, Defendant Deinet had not yet violated a court order when the Second Discovery Hearing occurred on January 24.  *See* ECF No. [58] at 3.

because, "even after multiple chances to answer," Defendants' answers either remained "nonresponsive" or "included an improper qualifier." *See* ECF No. [58] at 4–7. The Court also ordered each Defendant to provide a better answer to one RFA that contained a phrase Defendants found ambiguous, which the Court clarified during the Second Discovery Hearing. *See* ECF No. [58] at 4–7. The Court ordered the Defendants to produce all responsive documents and amended responses by January 31, 2025. *See* ECF No. [58] at 3–7.

Having granted Plaintiff all the substantive relief it sought during the Second Discovery Hearing, the Court granted Plaintiff's motions for Rule 37 monetary sanctions against both Defendants. *See* ECF No. [56]; ECF No. [57]; ECF No. [58] at 7–11. As it had at the First Discovery Hearing, the Court concluded that Rule 37 required awarding Plaintiff its attorney's fees for its successful motions to compel and that none of the three exceptions in that Rule applied. *See* ECF No. [58] at 8. In doing so, the Court again noted Defendants' disregard for their discovery obligations: "Defendant Aeva and Defendant Deinet have proven to be consistently nonresponsive, as both the Court's December 18 discovery order, *see* ECF No. [32], and Defendant Aeva's failure to comply with that order demonstrates." *See* ECF No. [58] at 8. The Court awarded Plaintiff $2,915 in attorney's fees, which is the amount it reasonably incurred to procure the improperly withheld discovery, and it ordered Defendants to pay those sanctions by March 20, 2025. *See* ECF No. [58] at 8–11.

Instead of ruling on Plaintiff's Motion to Strike and/or Motion for Default against Defendant Aeva, however, the Court took the request under advisement. *See* ECF No. [56]; ECF No. [58] at 8–9 n.5. The Court ordered the Parties to submit supplemental briefs on whether striking Defendant Aeva's pleadings and entering default against it was the appropriate remedy under the circumstances. *See* ECF No. [40]. The Parties timely filed those briefs. *See* ECF No.

[43]; ECF No. [44].

In support of its Motion to Strike and/or Motion for Default against Defendant Aeva, Plaintiff argued that, despite having "every opportunity to comply with their discovery obligations," Defendants "willfully, deliberately, and intentionally refused to comply with several Court-ordered obligations" even after being sanctioned twice. *See* ECF No. [44] at 1. Plaintiff argued that it was "prejudiced by Defendants' inexcusable delay and failure to comply" because discovery was "nearing its close" and that it had "become apparent that no sanction less than default entered against Defendants is appropriate." *See* ECF No. [44] at 1. In opposition, Defendants filed a one-page brief that contained only three provisions of black-letter law and no argument. *See* ECF No. [43].

### C.  Third Discovery Hearing (March 18, 2025)

About two and a half weeks after the Second Discovery Hearing, Plaintiff contacted the Court to request a third hearing (the "Third Discovery Hearing"). *See* ECF No. [46]. The Third Discovery Hearing was originally set to occur on February 26, 2025, *see* ECF No. [46], but it was later delayed until March 18, 2025 because defense counsel suffered a medical emergency, *see* ECF No. [59].[5]  At the Third Discovery Hearing, Plaintiff asked the Court to decide whether

---

[5] Between the Second Discovery Hearing and the Third Discovery Hearing, Plaintiff took several steps to try to mitigate the prejudice it suffered due to Defendants' failure to fulfill their discovery obligations. Those steps included filing: (1) a discovery status report in which it noted: "Plaintiff cannot certify it will complete discovery by the discovery deadline, due to the issues set forth in the Notice of Hearing (ECF No. 48) including Defendants' repeated failure to adequately respond to written discovery in violation of the Court's discovery orders," *see* ECF No. [49] at 2; and (2) an Unopposed Motion to Stay Case Management Deadlines as to Plaintiff Only Pending Resolution of Outstanding Discovery Disputes (the "Motion to Stay"), ECF No. [50]. In the Motion to Stay, Plaintiff argued "Defendants have willfully and brazenly disregarded not only their discovery obligations, but multiple Court orders," which prejudiced Plaintiff to such an extreme that there was a "meaningful chance" the Court would "strike Defendants' pleadings and enter default judgment against" them. *See* ECF No. [50] at 1, 9. For that reason, Plaintiff asked the Court to stay case deadlines as to it only because it was likely the case would conclude in default against Defendants, so there would be no need for Plaintiff "to incur the expenses and costs associated with pursuing additional discovery against Defendants and third-parties." *See* ECF No. [50] at 8–9. Judge

Defendants had "failed to comply with the Court's" order requiring them "to produce all responsive documents by January 31, 2025" and to determine the sufficiency of Defendants' responses to certain of Plaintiff's Interrogatories. *See* ECF No. [48] at 1. Plaintiff also asked the Court to award Rule 37 monetary sanctions for the attorney time it took to prepare the supplemental briefing the Court ordered at the Second Discovery Hearing and to request, prepare for, and attend the Third Discovery Hearing. *See* ECF No. [48] at 1–2.

During the Third Discovery Hearing, Plaintiff alerted the Court that it received a "minimal" production of only 145 pages in response to the Court's order memorializing the Second Discovery Hearing. *See* ECF No. [48-2]; ECF No. [48-3]; ECF No. [69-2]. That production included three categories of documents: (1) a few pages of business records from the Nevada Secretary of State's website, (2) a couple pages of text messages between Defendant Deinet and another person discussing Plaintiff's attempt to reach Defendant Deinet to discuss her overdue payment obligations, and (3) transaction records from a payment processor Defendants used to run their business. *See* ECF No. [69-2]. It did not include important requested documents, such as bank records, corporate formation documents for other entities owned by Defendant Deinet, and additional communications between Plaintiff and Defendants. *See* ECF No. [69-2].

Plaintiff also noted that Defendants' amended Interrogatory responses were both deficient and included the qualification "Discovery in this matter is ongoing," which implied that Defendants may in the future seek to supplement their responses. *See* ECF No. [48-2]. Although Plaintiff emphasized that Defendants' Interrogatory responses "were not perfect," it noted that, because discovery had since closed, it was willing to accept them if Defendants would remove the qualifier and confirm that they would not seek to supplement their responses. Finally, Plaintiff

_____

Bloom granted the Motion to Stay and stayed all case deadlines as to Plaintiff until the Court decided Plaintiff's request to strike Defendants' pleadings and enter default against them. *See* ECF No. [51].

alerted the Court that Defendant Aeva had not complied with the Court's order to pay the Rule 37 monetary sanctions of $2,557.50 in attorney's fees by February 23.  *See* ECF No. [32] at 9; ECF No. [38] at 9.  Instead, Plaintiff had received only one payment of $100 toward that amount, which defense counsel had represented to Plaintiff's counsel was all Defendant Aeva could afford to pay. Noting its skepticism about Defendant Aeva's inability to pay given its own independent research into Defendants' potential financial resources, Plaintiff asked the Court to order Defendant Deinet (who is the sole owner of Defendant Aeva) to show cause as to why she could not pay the entire sanctions amount by filing an affidavit under penalty of perjury.

In response, Defense counsel agreed that Defendants had not produced bank statements, but he did not know whether additional corporate formation documents or communications between Plaintiff and Defendants existed but had not been produced.  He explained that he communicated to Defendants what was required of them under the Court's orders and that he produced everything he received from them.  He also noted he told Defendants that their failure to comply with the Court's orders regarding both their discovery obligations and the payment of sanctions would likely result in more serious sanctions.  As to the monetary sanctions specifically, defense counsel noted that he explained to Defendants their obligation to pay the Rule 37 monetary sanctions, but Defendants indicated they were unable to pay.  He explained that he did not know whether Defendants' representations about ability to pay were accurate, but he suggested to them that they pay some amount as a showing of good faith, which is what prompted the $100 payment.

Ultimately, the Court ordered Defendants "to submit an affidavit or declaration under penalty of perjury as to their ability to pay the monetary sanctions previously entered in the case." *See* ECF No. [64].  The Court also acknowledged defense counsel's representation that Defendants would remove the qualifier from their Interrogatory responses and would not seek to supplement

those responses in the future, which resolved that issue.  The Court again took Plaintiff's Motion to Strike and/or Motion for Default — which Plaintiff renewed at the Third Discovery Hearing as to Defendant Aeva and requested for the first time against Defendant Deinet because she had violated the Court's second discovery order — under advisement, noting that Plaintiff had already briefed the issue as to both Defendants because, as Plaintiff explained at oral argument, there was no meaningful distinction between the corporate Defendant Aeva and the individual Defendant Deinet, who wholly owns Aeva.  *See* ECF No. [44].

In the days after the Third Discovery Hearing, Defendants filed several documents in response to it.  *See* ECF No. [65]; ECF No. [66]; ECF No. [70].  First, Defendants filed a notice indicating they had served Supplemental Responses to Plaintiff's RFPs.  *See* ECF No. [65].  Second, defense counsel filed a supplemental brief in which he explained that after he reported to Defendants what happened during the Third Discovery Hearing, they informed him that they had, in fact, given him bank statements and an email communication between Plaintiff and Defendants that were responsive to Plaintiff's discovery requests.  *See* ECF No. [66] at 1.  Defense counsel then checked his email correspondence and found those documents, which Defendants had given him on January 26, 2025.  *See* ECF No. [66] at 1.

Defense counsel explained he had "mistakenly and inadvertently left" those documents out of Defendants' earlier production but had since produced them along with supplemental discovery responses.  *See* ECF No. [66] at 1; ECF No. [69].  He noted the "error was that of counsel, and counsel alone," and that he wanted to "accept full responsibility for the mistake."  *See* ECF No. [66] at 2.  He requested "the Court's mercy and consideration."  *See* ECF No. [66] at 2.  Finally, Defendant Deinet filed the Court-ordered affidavit.  *See* ECF No. [70].  In it, she averred that Defendant Aeva "did not collect monies owed," so it could not "pay its bills," was evicted from

10

its operating facility, and was unable to operate.  *See* ECF No. [70].  She explained that Defendant Aeva lost 100% of its contracts, that she had not paid herself "since last year," and that her "other company has been operating at a loss."  *See* ECF No. [70].

**D.  Evidentiary Hearing (May 6, 2025)**

About a month after the Third Discovery Hearing, Plaintiff contacted the Court via email to request an evidentiary hearing for Defendant's contempt of Court.  Plaintiff explained that neither Defendant paid the monetary sanctions the Court ordered after the First and Second Discovery Hearings, and it argued that Defendant Deinet's affidavit did not articulate an inability to pay.  Plaintiff also challenged the truthfulness of Deinet's averment that Defendant Aeva could not operate after being evicted because, according to Plaintiff's own research, Aeva was still operational.  As a result, Plaintiff asked the Court to require Defendant Deinet to appear in person at an evidentiary hearing to explain under oath why Defendants should not be held in civil contempt for failing to pay the Court-ordered monetary sanctions.  *See* ECF No. [75].

The Court set that evidentiary hearing on Plaintiff's Motions for Civil Contempt, although not without some difficulty: the Court had to order defense counsel to confer with Plaintiff's counsel to find a mutually available date (much like the Court had to do before the First Discovery Hearing), and the Court had to order defense counsel <u>twice</u> to provide Defendant Deinet's availability — the second time because Deinet still had not given that information to defense counsel almost a week after the Court ordered her to do so.[6]  When Deinet finally complied with the Court's instructions, she represented that she was financially unable to travel to Miami for the hearing.  Although Plaintiff suggested Deinet's representation was untruthful, it did not object to

---

[6] The Court ordered defense counsel to do this by email, as my Order Setting Discovery Procedures requires the Parties to contact my chambers by email, copying all counsel of record, for a hearing on any discovery-related matters.  *See* ECF No. [14].

her appearing for the evidentiary hearing remotely, so the Court allowed her to do so. Because of Defendants' delayed responses, the Court could not schedule the evidentiary hearing for two full weeks following Plaintiff's request for one.

The Court held the evidentiary hearing on May 6, 2025 (the "Evidentiary Hearing"). *See* ECF No. [74]; ECF No. [77]. At the outset of the Evidentiary Hearing, Plaintiff informed the Court that it had received three additional $100 payments from Defendants toward the monetary sanctions awards, making the total amount paid $400. Defense counsel confirmed that total. The Court then put Defendant Deinet under oath and allowed Plaintiff's counsel to question her about Defendants' finances and assets. *See* ECF No. [77]. She testified as follows.

### 1. Defendant Deinet's Testimony[7]

Defendant Deinet owns and controls (or has owned and controlled) many different entities, including Defendant Aeva; Aeva 2, LLC ("Aeva 2"); Aeva Management; and Aeva Specialty Pharmacy (collectively, the "Aeva Enterprise").[8] Aeva Specialty Pharmacy is a pharmacy that operates out of Las Vegas and provides pharmaceutical drugs in that area. Aeva and Aeva 2 are entities that contribute to running Aeva Specialty Pharmacy's business, including by holding the money that facilitates business operations. For example, Aeva 2 has access to a credit or debit card issued by Wells Fargo, and it has about $4,000 total in bank accounts held at Wells Fargo and the Bank of Montreal ("BMO"). Aeva Management employs the workers who operate the other Aeva entities, and it holds bank accounts at BMO and Bank of America. Although the Aeva Enterprise used a separate payroll company in the past, it no longer does.

---

[7] For clarity, the Court has distilled and reorganized Defendant Deinet's testimony.

[8] Deinet also owns and controls an entity called TUV, LLC ("TUV"), which was formed in October 2024 and through which she intended to "sell stuff on Amazon." At some point, TUV signed a lease on a space next to Aeva's operating facility, but Aeva and TUV were both evicted later in October 2024.

Some of the Aeva entities are currently operational, some have ceased operations, and some will soon cease operations.  Defendant Aeva, for example, was evicted from its operating facility and has not been operating since "last year," which is why it cannot pay the monetary sanctions entered against it.  Aeva 2 has seven employees and generates "some" revenue but "not enough to sustain itself," so it will "cease operating in June."[9]  Aeva Management, which is technically the employer of Aeva 2's staff of seven, can "barely" pay those people and will also "cease operating" at some point, though Deinet did not say when.  The Aeva Enterprise still has "some inventory," but the "volume is so low" that it and Deinet are "hanging on for dear life until it's over."  When asked when the Aeva Enterprise's financial trouble began, Deinet answered only that it had "been a while."

When asked whether the Aeva Enterprise at one time had a "fleet of over 50 vehicles," Deinet denied that number but acknowledged it might have had 15 vehicles. When asked how many of those vehicles the Aeva Enterprise still owns, Deinet said she does not know because she is "not in charge of that" — an unidentified "former employee" is — but guessed "a couple" because the rest "got towed" or were "broken down."  When asked whether she has access to any vehicle the Aeva Enterprise still owns, she did not answer directly but said she would have to "find where everything is" and "figure out where the keys are."  And when asked whether she could sell any vehicle the Aeva Enterprise still owns and use the proceeds to satisfy the monetary sanctions orders, she said no.  When asked why not, she answered that those vehicles were "maybe valued at $3,000 if they even work" and that she does not know if they are even registered, though she knows they are not insured.

Deinet confirmed that, at some point, an entity she controlled owned a boat, possibly a

---

[9] Deinet initially testified Aeva 2 had no employees, but when pressed she clarified that Aeva Management technically employs and pays Aeva 2's employees.

2022 Malibu.  She testified that she did not use the boat for personal reasons and instead used it "for work."  When asked how she used the boat for work, she said it was a long time ago and that people used to "take it out."  However, a "few months" before the Evidentiary Hearing, she gave the boat to "a different entity" for no consideration because she could not afford to maintain it. When pressed, she could not identify the entity that received the boat and did not "even know where the keys are" for it.

Regarding her own finances, Deinet testified that she devotes all her time to the Aeva Enterprise and does not work anywhere else.  Given the Aeva Enterprise's financial troubles, Deinet has not paid herself in "an extremely long time" and has "maybe $18" in the bank, which is why she cannot pay the monetary sanctions entered against her.  She has not paid for any of her expenses out of her own pocket in the two months before the Evidentiary Hearing.  Because she has not been paying herself, she is "just trying to live as meagerly" as she "possibly can" until she gets "through this whole situation."

Deinet testified from her apartment, which is located in a "luxury high rise" in the MGM City Center on the Las Vegas Strip.  Because she uses the apartment as her office in addition to her personal residence, Aeva 2 pays her rent.  At first, Deinet testified that Aeva 2 is not paying for any of her other personal expenses, but she later confirmed that she buys about $75 a week in groceries using Aeva 2's funds.  She said she "usually" eats at her parents' house or at home using the $75 of groceries she buys with Aeva 2's money.  She last left Nevada in September or October 2024, when a friend "took [her] to Disneyland."  She paid for nothing during that trip.

Deinet has no car registered in her name, but within the past three years, she has had registered — either to herself or to a company she controlled — a Mercedes "G Wagon," which cost "over $150,000," and a Tesla Model X Plaid Series, which Plaintiff's counsel represented is

"the most expensive" Tesla Model X available.  She sold the G Wagon less than two years before the Evidentiary Hearing, but the Tesla "was given away" for no consideration because she could not afford the registration or insurance.  When pressed, Deinet explained that she gave the Tesla to "somebody who is planning on helping" her "in the future" with, for example, paying the sanctions at issue in this case.  At first, Deinet testified that the person who received the Tesla does not owe her money and that there was no written agreement memorializing the deal, but later she testified that the Tesla may have been given to an entity and that there is "documentation" somewhere (which she does not have) transferring the title.[10]

On cross examination, defense counsel asked Deinet to confirm that she understood her testimony was under penalty of perjury and that all her answers were true to the best of her knowledge.  Deinet confirmed both things.  Plaintiff's counsel had no questions on redirect.

### 2.   Counsel's Arguments about the Motions for Civil Contempt

After Deinet's testimony concluded, the Court allowed counsel to argue their positions on whether Defendants should be held in civil contempt for violating the Court's sanctions orders. Plaintiff argued that Deinet's testimony was not credible.  Specifically, Plaintiff argued it is "very difficult to believe" Deinet would simply give away, for no consideration, a Tesla "valued at over $100,000" and a boat.  Plaintiff argued it is also "very hard to believe" Deinet is "not spending any money whatsoever living," even though she is "operating a company" that has employees.  To Plaintiff, it is ironic Deinet testified she is not spending any money to live while giving that testimony from a luxury condo in one of the most expensive areas of Las Vegas.  Plaintiff asked the Court to find that Deinet's testimony was not credible, which aligns with the "pattern of disregard for court-ordered obligations" Defendants have shown throughout the case.

---

[10] After being asked many times, Deinet eventually identified the person to whom she physically gave the Tesla as a "family friend" named Sylvia Hernandez.

CASE NO. 24-CV-23649-BLOOM/Elfenbein

Along with arguing that Deinet's testimony was untruthful, Plaintiff further argued Deinet has "not exercised any diligence" or made any efforts locate assets of the Aeva Enterprise that could be used to satisfy the sanctions orders. Her testimony indicated there are "vehicles that may or may not have value," but she has not searched for them so that she can attempt to sell them to pay the sanctions orders. And because Defendants failed to provide information about those assets during the required meet-and-confer process before the Evidentiary Hearing, Plaintiff was unable to search for the assets or to contact the people Deinet mentioned in her testimony. As a result, Plaintiff was "hamstrung a little bit" without possible rebuttal testimony or rebuttal evidence about assets that "may or may not be had at Wells Fargo or Bank of America." Still, because Deinet's testimony was not credible, Plaintiff argued the Court should find that Defendants can pay the sanctions awards and that they are in contempt for not paying those awards as the Court ordered them to do.

In response, Defendants argued that the Motions for Civil Contempt should fail because Plaintiff did not meet the evidentiary threshold. Defendants argued that the only evidence in support of the Motions was Deinet's testimony, which was that the entities in the Aeva Enterprise have financial issues and are unable to pay the sanctions orders. Defendants asserted that there was nothing in the record to refute that testimony. For that reason, Defendants asked the Court to deny the Motions for Civil Contempt.

### 3. Counsel's Arguments about the Motion to Strike and/or Motion for Default

Because Plaintiff had not yet been heard on it, the Court also allowed Plaintiff to respond to Defendants' supplemental brief about the bank records and email they produced a few hours after the Third Discovery Hearing.[11] *See* ECF No. [66]. Plaintiff acknowledged the supplemental

---

[11] Plaintiff first noted the supplemental brief was procedurally improper under this District's Local Rules, which require both pre-filing conferral, *see* S.D. Fla. L.R. 7.1(a)(2), and leave of court, *see* S.D. Fla. L.R.

production that accompanied Defendants' supplemental brief contained some of the bank records it sought, in particular those from BMO through November 2024.  The supplemental production did not, however, contain any bank records from Wells Fargo or Bank of America, banks that Defendant Deinet testified held accounts for some of the entities in the Aeva Enterprise.  Plaintiff also noted the supplemental production did not contain the other records it sought, like credit card statements, cash advance documents, or formation information about the other Aeva entities, which the Court asked defense counsel about at the Third Discovery Hearing.

Because those documents remain unproduced, Plaintiff argued it does not know how the other Aeva entities operate, which has prevented it from ascertaining whether Defendant Aeva transferred any assets to Aeva 2, Aeva Management, Aeva Specialty Pharmacy, or any other entity Defendant Deinet controls.[12]  Plaintiff argued Deinet's testimony made clear that assets were, in fact, transferred, so the failure to produce those additional records was not harmless.  Plaintiff argued that, had defense counsel actually done everything possible to get the missing documents (as he represented at the Third Discovery Hearing), Defendants would have produced at least the BMO bank records and the email earlier than they did.  That is true because, had defense counsel talked to Defendant Deinet before the Third Discovery Hearing, she would have told him that she gave those records to him already, as defense counsel represented in Defendants' supplemental brief.  *See* ECF No. [66].

Finally, Plaintiff argued the minor supplemental document production that accompanied

---

7.1(c)(1) (noting that only certain "memoranda of law" can be "filed and served without prior leave of Court").  Plaintiff's counsel asserted that, had defense counsel conferred as the Local Rules require, he would have explained that the proper procedure required Defendants to file a motion for leave of court to submit the supplemental brief.  Plaintiff argued that the procedural failure deprived it of an opportunity to respond with its own brief.  The Court cured that issue by allowing Plaintiff to respond orally during the Evidentiary Hearing.

[12] Plaintiff's counsel represented that there is, at minimum, one other such entity called Aeva 3.

the supplemental brief resolved neither the discovery deficiencies nor the "greater issue" of Defendants' consistent violations of the Court's orders. Plaintiff noted that the supplemental production did not cure the discovery deficiencies, as many documents remained outstanding and discovery was closed. And Plaintiff argued that, even if the Court extended the discovery deadline to allow Plaintiff to get additional documents and information — which Deinet's testimony made clear exist because she identified other Aeva entities, other bank accounts, and other assets — Plaintiff would encounter the same problems because of Defendants' constant noncompliance. For those reasons, Plaintiff argued the only option left to remedy the prejudice it suffered was for the Court to strike Defendants' pleadings and enter default judgment.

In response, defense counsel again took responsibility for the failure to timely produce the BMO bank records and email that accompanied the supplemental brief. *See* ECF No. [69]. As he explained in the supplemental brief, defense counsel reiterated that it was his mistake, *see* ECF No. [66], and he offered to pay the sanctions himself if the Court entered a third monetary sanctions order based on the untimely supplemental production. On the substance of the Motion to Strike and/or Motion for Default, Defendants argued that these motions should be denied and that discovery should continue.

In reply, Plaintiff clarified that it was not asking the Court to strike Defendants' pleadings based on defense counsel's mistake or on the untimely supplemental production Defendants made hours after the Third Discovery Hearing. Instead, Plaintiff was asking the Court to strike Defendants' pleadings and enter default against them based on their repeated disregard for the Court's orders and their pattern of noncompliance with their discovery obligations. Plaintiff noted that Defendants still had not completed their production, which remained heavily deficient just like the untimely supplemental production was. Plaintiff theorized that, had Defendants ever made

18

a complete production, even if it were late, striking the pleadings may then be unnecessary. But because the discovery deficiencies were never adequately cured, discovery was closed, and Defendants' pattern of noncompliance was not broken, Plaintiff argued that the Court should grant the Motion to Strike and/or Motion for Default and bring the case to a close.

## II.   LEGAL STANDARDS

### A.   Civil Contempt

"Contempt of court is the disregard of judicial authority." *Popular Bank of Fla. v. Banco Popular de Puerto Rico*, 180 F.R.D. 461, 465 (S.D. Fla. 1998); *see also Ga. Power Co. v. NLRB*, 484 F.3d 1288, 1291 (11th Cir. 2007) (defining "civil contempt" as the "willful disregard of the authority" of the court). When a party fails to comply with an order of the court, the court "may use the remedy of a citation of contempt to enforce" that order. *See Combs v. Ryan's Coal Co.*, 785 F.2d 970, 980 (11th Cir. 1986); *Chairs v. Burgess*, 143 F.3d 1432, 1436 (11th Cir. 1998) (noting that civil contempt proceedings are brought to enforce a court order that requires a party to act in some defined manner). A court's power to use a citation of civil contempt to compel compliance with its directives comes both from its inherent authority, *see Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 831 (1994) (noting courts "have embraced an inherent contempt authority as a power necessary to the exercise of all others" (citations and quotation marks omitted)); *Popular Bank*, 180 F.R.D. at 465 ("The court's power to enforce compliance with its lawful orders is inherent."), and from the Federal Rules of Civil Procedure, *see* Fed. R. Civ. P. 70(e) (noting a court may hold a "disobedient party in contempt"); Fed. R. Civ. P. 37(b)(2)(A)(vii) (allowing a court to treat "as contempt of court the failure to obey any" discovery "order except an order to submit to a physical or mental examination"). Either way, "[c]ivil contempt proceedings may be employed to coerce a contemnor into compliance with the court's

order and to compensate a complainant for losses sustained."[13]  *Popular Bank*, 180 F.R.D. at 465.

"A party seeking civil contempt bears the initial burden of proving by clear and convincing evidence that the alleged contemnor has violated an outstanding court order." *Commodity Futures Trading Comm'n v. Wellington Precious Metals, Inc.*, 950 F.2d 1525, 1529 (11th Cir. 1992).  "The clear and convincing evidence must establish that: (1) the allegedly violated order was valid and lawful; (2) the order was clear and unambiguous; and (3) the alleged violator had the ability to comply with the order." *Ga. Power Co.*, 484 F.3d at 1291 (emphasis omitted).  "Once a prima facie showing of a violation has been made, the burden of production shifts to the alleged contemnor, who may defend his failure on the grounds that he was unable to comply." *Wellington Precious Metals*, 950 F.2d at 1529.  That is because, "[w]here compliance is impossible, neither the moving party nor the court has any reason to proceed with the civil contempt action." *United States v. Rylander*, 460 U.S. 752, 757 (1983); *see also Combs*, 785 F.2d at 983 ("[I]t is improper to impose contempt sanctions of any sort if the alleged contemnor is not able to satisfy the court's directives.").

To "succeed on the inability defense, the alleged contemnor must go beyond a mere assertion of inability and establish that he has made in good faith all reasonable efforts to meet the terms of the court order he is seeking to avoid." *Wellington Precious Metals*, 950 F.2d at 1529 (citation and quotation marks omitted).  Indeed, "the alleged contemnor" must "produce detailed evidence specifically explaining why he cannot comply." *Parker v. Scrap Metal Processors, Inc.*,

---

[13] The animating purpose behind a contempt sanction, and "the character of the relief itself," determine whether it is civil or criminal. *See Bagwell*, 512 U.S. at 828–29 (quotation marks omitted). A "contempt sanction is considered civil if it is remedial, and for the benefit of the complainant." *Id.* at 827 (quotation marks omitted); *see also id.* (defining "civil contempt sanctions" as "those penalties designed to compel future compliance with a court order," which "are considered to be coercive and avoidable through obedience"); *Serra Chevrolet, Inc. v. Gen. Motors Corp.*, 446 F.3d 1137, 1147 (11th Cir. 2006).  In contrast, a contempt sanction is criminal if it "is punitive, to vindicate the authority of the court."  *See Bagwell*, 512 U.S. at 828 (quotation marks omitted).

468 F.3d 733, 740 (11th Cir. 2006). "[E]vasive and incomplete testimony will not satisfy" the alleged contemnor's "burden of production." *See Wellington Precious Metals*, 950 F.2d at 1530. This is a "high standard" that courts "construe . . . strictly." *See Combs*, 785 F.2d at 984. "Even if the efforts" a party "did make were substantial, diligent or in good faith, the fact that he did not make all reasonable efforts" would prevent him from "rebut[ting] the prima facie showing of contempt." *See id.* (cleaned up).

If "the alleged contemnor" makes "a sufficient showing," however, the "burden shifts back to the initiating party" to prove "ability to comply." *Wellington Precious Metals*, 950 F.2d at 1529; *see also Combs*, 785 F.2d at 984 (noting that the party seeking to show contempt "retains the ultimate burden of proof"). The court's "focus in a civil contempt proceeding is not on the subjective beliefs or intent of the alleged contemners in complying with the order, but whether in fact their conduct complied with the order at issue." *Ga. Power Co.*, 484 F.3d at 1291 (quotation marks omitted). While due process requires "a hearing in which the alleged contemnor may explain why the court should not make a contempt finding," *see Watkins*, 943 F.2d at 1304, that hearing can be an ordinary civil proceeding, *see Serra Chevrolet*, 446 F.3d at 1147 ("Civil contempt may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard"); *Thomas v. Blue Cross & Blue Shield Ass'n*, 594 F.3d 814, 821 (11th Cir. 2010) (noting the alleged contemnor can "explain his noncompliance at a show cause hearing").

If, after hearing from the alleged contemnor, the court decides to impose civil contempt sanctions, they may be "compensatory" or "coercive." *See Watkins*, 943 F.2d at 1304. When a court chooses "to impose sanctions designed to ensure compliance, the sanctions cannot be any greater than necessary to ensure such compliance." *Id.* "When fashioning a sanction to secure compliance, a district court should consider the character and magnitude of the harm threatened

21

by continued contumacy and the probable effectiveness of any suggested sanction in bringing about the result desired." *Id.* (quotation marks omitted).

### B.  Rule 37 Sanctions for Discovery Violations

"Discovery is one of the working tools of the legal profession."  *Hickman v. Taylor*, 329 U.S. 495, 515 (1947) (Jackson, J., concurring).  That is true because "[m]utual knowledge of all the relevant facts gathered by both parties is essential to proper litigation."  *See id.* at 507 (majority opinion).  Because of discovery's importance in litigation, *see Phillips v. Ins. Co. of N. Am.*, 633 F.2d 1165, 1168 (5th Cir. Unit B 1981) ("We have consistently regarded the discovery process as a serious matter and will continue to do so." (citations omitted)), the Federal Rules of Civil Procedure provide several mechanisms a party can use to force compliance with unfulfilled discovery obligations.

If "a party fails to admit what is requested under Rule 36 and" the "requesting party later proves a document to be genuine or the matter true," for example, "the requesting party may move that the party who failed to admit pay the reasonable expenses, including attorney's fees, incurred in making that proof" unless one of four exceptions applies.  *See* Fed. R. Civ. P. 37(c)(2).  And if "a party, after being properly served with interrogatories under Rule 33 . . . , fails to serve its answers, objections, or written response," the court "may, on motion, order sanctions."  *See* Fed. R. Civ. P. 37(d)(1)(A)(ii).  Those sanctions "may include" six severe consequences, ranging from the case-impacting (like ordering that certain facts be taken as true) to the case-dispositive (like dismissing an action).  *See* Fed. R. Civ. P. 37(d)(3) (noting the sanctions may include "any of the orders listed in Rule 37(b)(2)(A)(i)–(vi)").  The court must also require the noncompliant party to pay the movant's reasonable expenses.  *See* Fed. R. Civ. P. 37(d)(3) ("Instead of or in addition to these sanctions, the court must require the party failing to act, the attorney advising that party, or

both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust.").

Additionally, "[o]n notice to other parties and all affected persons, a party may move for an order compelling disclosure or discovery." Fed. R. Civ. P. 37(a)(1); *see also Hickman*, 329 U.S. at 507 ("To that end, either party may compel the other to disgorge whatever facts he has in his possession."). This principle applies to all sorts of discovery requests, including interrogatories propounded under Rule 33 and requests for production propounded under Rule 34. Fed. R. Civ. P. 37(a)(3)(B)(iii)–(iv); *see also* Fed. R. Civ. P. 36(a)(6) (allowing the court to "determine the sufficiency of an answer or objection" to requests for admission propounded under Rule 36(a) and, when an answer is noncompliant or an objection is unjustified, to "order either that the matter is admitted" or that "an answer" or "amended answer be served"). And it applies both to complete failures to respond and to "evasive or incomplete" responses. *See* Fed. R. Civ. P. 37(a)(4) (noting an "evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond").

If a party moves to compel discovery and either "the motion is granted" or "the disclosure or requested discovery is provided after the motion was filed," the Rules provide for fee shifting to compensate the party for the effort it expended on procuring the discovery it was due. In fact, in that situation, "the court must, after giving an opportunity to be heard, require the party . . . whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees." Fed. R. Civ. P. 37(a)(5)(A). The "court must not order this payment" in only three enumerated scenarios. *See* Fed. R. Civ. P. 37(a)(5)(A)(i)–(iii) (including if the movant did not first attempt "in good faith to obtain the disclosure or discovery without court action"; if the "nondisclosure,

response, or objection was substantially justified"; or if "other circumstances make an award of expenses unjust").

Finally, if a party does not obey the court's order compelling discovery, the court "may issue further just orders," including more severe sanctions, to coerce compliance. *See* Fed. R. Civ. P. 37(b)(2)(A). These more severe sanctions include "directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims"; "prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence"; "striking pleadings in whole or in part"; "staying further proceedings until the order is obeyed"; "dismissing the action or proceeding in whole or in part"; "rendering a default judgment against the disobedient party"; and "treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination." *See* Fed. R. Civ. P. 37(b)(2)(A)(i)–(vii). The court also "must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure" to obey the discovery order, "unless the failure was substantially justified or other circumstances make an award of expenses unjust." *See* Fed. R. Civ. P. 37(b)(2)(C) (noting the court must award reasonable expenses "[i]nstead of or in addition to" the remedies in Rule 37(b)(2)(A)(i)–(vii)).

### C. When Striking Pleadings and/or Entering Default Under Rule 37(b)(2) is Appropriate

"Rule 37 is designed to protect basic institutional values: 'Rule 37 sanctions are imposed not only to prevent unfair prejudice to the litigants but also to insure the integrity of the discovery process.'" *Telectron, Inc. v. Overhead Door Corp.*, 116 F.R.D. 107, 129 (S.D. Fla. 1987) (Marcus, J.) (quoting *Aztec Steel Co. v. Florida Steel Corp.*, 691 F.2d at 480, 482 (11th Cir. 1982)). "As a general matter, the imposition of sanctions for failure to provide discovery rests with the sound

24

discretion of the district court." *Stansell v. Revolutionary Armed Forces of Colombia*, 120 F.4th 754, 763 (11th Cir. 2024) (quotation marks omitted). But "sanctions of last resort — such as dismissals or default judgments — are appropriate only when less drastic sanctions would not ensure compliance with the court's orders." *Hornady v. Outokumpu Stainless USA, LLC*, 118 F.4th 1367, 1378 (11th Cir. 2024) (quotation marks omitted); *see also Stansell*, 120 F.4th at 763.

"[R]esort to this ultimate sanction under Rule 37 serves two important goals: to penalize and to deter conduct which is in flagrant disregard of the rules of discovery." *Telectron, Inc.*, 116 F.R.D. at 129–30; *see also National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 643 (1976). "Because of its severe consequences, a default judgment sanction requires a willful or bad faith failure to obey a discovery order." *Stansell*, 120 F.4th at 763 (quotation marks omitted). "Before the ultimate sanction of default judgment may be entered, this Court must make the following findings: (1) that Defendant acted willfully or in bad faith; (2) that Plaintiff was prejudiced by Defendant's conduct; and (3) that lesser sanctions would not serve the punishment-and-deterrence goals set forth in *National Hockey League* and its progeny." *Telectron, Inc.*, 116 F.R.D. at 131; *see also Wouters v. Martin Cnty.*, 9 F.3d 924, 934 (11th Cir. 1993); *United States v. Certain Real Prop. Located at Route 1*, 126 F.3d 1314, 1317 (11th Cir. 1997) (requiring the violation of a discovery order).

"A party demonstrates bad faith by, *inter alia*, delaying or disrupting the litigation or hampering enforcement of a court order." *Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1306 (11th Cir. 2009); *see also Malautea v. Suzuki Motor Co.*, 987 F.2d 1536, 1542–44 (11th Cir. 1993) (finding defendants willfully violated three district court orders to provide discoverable information when they failed to give a "credible explanation" about why they could not comply); *Hornady*, 118 F.4th at 1378 (finding defendant acted in bad faith by "willfully

and repeatedly" refusing to provide discoverable records in its control, which "intentionally sabotaged the judicial process").

"These prerequisites have been developed as a means of ensuring the proper balance between the need to engender good-faith adherence to the rules of discovery, on the one hand, and a commitment to protecting the parties' constitutional and policy interests in a full and fair adjudication of their claims, on the other." *Telectron, Inc.*, 116 F.R.D. at 131. If these prerequisites are met, it does "not violate due process" for a court "to strike" pleadings "and render a default judgment against a defendant who failed to comply with a pretrial discovery order." *See Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 705 (1982). That is because striking pleadings and entering default under Rule 37(b)(2) "is nothing more than the invocation of a legal presumption" of "bad faith and untruth . . . begotten from the suppression or failure to produce the proof ordered" or, "what is the same thing, the finding of a constructive waiver" of the noncompliant party's ability to assert the merits of its defenses. *See id.* at 705–06 (quotation marks omitted).

Finally, "[w]hen lesser sanctions would be ineffective, Rule 37 does not require the vain gesture of first imposing those ineffective lesser sanctions." *Malautea*, 987 F.2d at 1544. Before a court can enter default judgment, however, it must be satisfied that "there is a sufficient basis in the pleadings for the judgment entered." *See Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1245 (11th Cir. 2015) (quotation marks omitted). When making that determination, "a defaulted defendant is deemed to admit the plaintiff's well-pleaded allegations of fact" but "is not held to admit facts that are not well-pleaded or to admit conclusions of law." *Id.* (quotation marks omitted). If the plaintiff's allegations, as admitted by the defendant's default, could "survive a motion to dismiss for failure to state a claim," default judgment is appropriate. *See id.*; *Chudasama*

*v. Mazda Motor Corp.*, 123 F.3d 1353, 1370 n.41 (11th Cir. 1997) ("[A] default judgment cannot stand on a complaint that fails to state a claim.").

And, of course, when evaluating a motion to dismiss, the "court looks to see whether the complaint contains sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Surtain*, 789 F.3d at 1245 (alteration adopted, quotation marks omitted); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "This plausibility standard is met when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quotation marks omitted). When performing this analysis, the court may consider the complaint itself along with any "documents attached to" it "or incorporated in the complaint by reference." *See Saunders v. Duke*, 766 F.3d 1262, 1270 (11th Cir. 2014).

## III.   DISCUSSION

As explained above, Plaintiff asks the Court to hold Defendants in civil contempt for violating the Court's discovery orders by failing to pay Rule 37 monetary sanctions. *See* ECF No. [75]; Fed. R. Civ. P. 37(a)(5)(A), (b)(2)(A)(vii). Plaintiff also asks the Court to strike Defendants' Answer and enter default judgment against them because they have willfully violated the Court's discovery orders, less severe sanctions have not coerced Defendants into complying with their discovery obligations, Defendants' noncompliance have prejudiced them. *See* ECF No. [44]; Fed. R. Civ. P. 37(b)(2)(A)(iii), (vi). The Court takes each request in turn.

### A.   Motions for Civil Contempt (ECF No. [78] and ECF No. [79])

Plaintiff contends Defendants can pay the sanctions awards, which the Court imposed in lawful, unambiguous orders, yet have not paid those awards. *See* ECF No. [75]. Defendants argue they are unable to pay the sanctions awards because Defendant Aeva has not operated since 2024

and Defendant Deinet's other businesses are in financial trouble, so she has not paid herself since 2024. The Court agrees with Plaintiff.

To support a finding of civil contempt, Plaintiff must prove by clear and convincing evidence that: (1) the Court's Rule 37 monetary sanctions orders are valid, lawful, clear, and unambiguous; (2) Defendants violated those orders; and (3) Defendants had the ability to comply with those orders. *See Wellington Precious Metals, Inc.*, 950 F.2d at 1529; *Ga. Power Co.*, 484 F.3d at 1291. There is no dispute about the first and second prongs of that test. Defendants do not challenge the validity, lawfulness, or clarity of the Rule 37 monetary sanctions orders, nor do they contend that they have fully paid those Rule 37 monetary sanctions orders. Instead, at the Evidentiary Hearing defense counsel confirmed that, as of May 6, Defendants had paid only $400 of the $5,472.50 they owe.

The dispute here centers on the third prong of the test: whether Defendants have the ability to pay. Defendants can prevent the imposition of civil contempt by showing an inability to comply with the Court's orders despite, in good faith, making all reasonable efforts to satisfy those orders. *See Wellington Precious Metals*, 950 F.2d at 1529; *Rylander*, 460 U.S. at 757; *Combs*, 785 F.2d at 983. But to do so, Defendants must produce detailed evidence specifically explaining why they cannot comply. *See Parker*, 468 F.3d at 740. This is a high standard the Court must construe strictly, so Defendants will not meet it if they do not show they made all reasonable efforts to pay the Rule 37 monetary sanctions orders, even if the efforts they made were substantial, diligent, or in good faith. *See Combs*, 785 F.2d at 984.

Defendants attempted to prove their inability to pay through Defendant Deinet's testimony at the Evidentiary Hearing. *See Watkins*, 943 F.2d at 1304 (noting alleged contemnors can explain why the court should not make a contempt finding at a hearing); *Serra Chevrolet*, 446 F.3d at 1147

("Civil contempt may be imposed in an ordinary civil proceeding upon notice and an opportunity to be heard"); *Thomas*, 594 F.3d at 821 (noting alleged contemnors can explain noncompliance at a show cause hearing). And indeed, as thoroughly catalogued above, Deinet repeatedly testified that all the entities in the Aeva Enterprise were in financial trouble and either had already or would soon cease operating. She also repeatedly testified that she personally has no money to pay the Rule 37 monetary sanctions orders because she devotes all her time to the Aeva Enterprise, does not otherwise work, has not received a paycheck since 2024, and currently has about $18 in the bank. Had that testimony been credible, it might have satisfied Defendants' burden to show they are unable to pay the Rule 37 monetary sanctions orders. But having observed Defendant Deinet's testimony and demeanor, the Court finds that it was not credible. *See, e.g.*, *United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002) (valuing the ability to "personally" observe testimony); *Viehman v. Schweiker*, 679 F.2d 223, 227–28 (11th Cir. 1982) (valuing the "ability to view first-hand the demeanor of the witness").

While there are no specific criteria for assessing credibility, factfinders often look to a witness's demeanor, tone, body language, candor, and responsiveness; the inherent plausibility or implausibility of the witness's testimony; the consistency of the witness's testimony with other record evidence; any inaccuracies in the witness's testimony; and the context and atmosphere within which the witness testifies. *See League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 938 (11th Cir. 2023) (crediting a trial court's determination, based on a witness's "'face and body language,' over Zoom, that the witness was lying"); *Reiterman v. Abid*, 26 F.4th 1226, 1234–35 (11th Cir. 2022) (noting that "variations in demeanor and tone of voice . . . bear so heavily on the listener's understanding of and belief in what is said" (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985)); *Amlong & Amlong, P.A. v. Denny's, Inc.*, 500 F.3d

1230, 1245–46 (11th Cir. 2007); *Chen v. U.S. Att'y Gen.*, 463 F.3d 1228, 1231 (11th Cir. 2006);

*Rice v. Collins*, 546 U.S. 333, 343 (2006) (Breyer, J., concurring) (noting "the factors that underlie

credibility: demeanor, context, and atmosphere"). In the civil contempt context, evasive and

incomplete testimony will not satisfy an alleged contemnor's burden. *See Wellington Precious*

*Metals*, 950 F.2d at 1530.

Here, the Court finds that Deinet's testimony was replete with vague, evasive, incomplete,

and implausible answers. Deinet could not (or would not) give basic information about the Aeva

Enterprise, including when exactly its financial trouble began, when Aeva Management would

cease operating, how many vehicles it owns, whether any of those vehicles work, where those

vehicles (or their keys) are located, what work purpose a boat the Aeva Enterprise once owned

served, where that boat is now, what entity she gave that boat to, and when she signed a lease for

an operating facility used by TUV, LLC. She seemingly had trouble remembering which of the

Aeva entities had access to a credit or debit card, how the Aeva Enterprise paid for its inventory

and its bills, and when and to whom she sold (or gave away for no consideration) expensive cars.

The information Deinet did give was implausible and inconsistent at best. She testified

that the Aeva Enterprise is under such financial strain that it cannot pay the Rule 37 monetary

sanctions awards, but it still has inventory, assets, multiple bank accounts, and at least $4,000 in

the bank. She testified that she works only for the Aeva Enterprise, which has not paid her since

2024, but she gave away a Tesla and a Malibu boat for nothing in exchange. She testified that she

is trying to live as meagerly as she possibly can until she gets through this whole situation, but she

continues to live in a luxury condominium on the Las Vegas Strip. She testified that she has not

received a paycheck from the Aeva Enterprise in an extremely long time and has $18 in the bank,

but she somehow spends $75 a week in groceries.

Deinet first testified that Aeva 2 is not paying for any of her personal expenses except her rent, but she later testified that the $75 for groceries comes from Aeva 2's funds. She testified she cannot sell any vehicle the Aeva Enterprise still owns to use the proceeds to satisfy the monetary sanctions orders, but she later admitted those vehicles had some value (maybe $3,000). She testified that she gave away her Tesla for no consideration because she could not afford the registration or insurance, but she later testified that she gave the Tesla to somebody who is planning to help her in the future with, for example, paying the sanctions at issue in this case. And she testified that the person who received the Tesla does not owe her money and that there was no written agreement memorializing the deal, but she later testified that it may have been given to an entity and that there is "documentation" somewhere (which she does not have) transferring the title.

To find Deinet's testimony credible, the Court would have to believe that Deinet lives in an expensive building in an expensive area of an expensive city while running insolvent businesses, receiving no paycheck, and having no savings. The Court would have to believe that Deinet, who gets free food from her parents and free trips to Disneyland from her friends, has help eating and traveling but has no help paying her court-ordered debts to Plaintiff — despite giving her Tesla to someone who, in her own words, intends to help her. The Court would have to believe that a businesswoman savvy enough to own multiple entities, assets, and accounts does not know even basic information about those entities, assets, and accounts because she has left those details up to unnamed former employees. The Court does not believe any of those things, and it does not believe Deinet's answers were truthful.[14] As a result, the Court finds that Deinet's testimony was

---

[14] The Court notes that, throughout her testimony, Deinet often repeated Plaintiff's counsel's questions back to him in a high-pitched tone, which suggested either that she did not understand the questions or that she was being purposefully evasive. The Court finds she was feigning confusion and being evasive.

not credible.

Because Deinet's testimony was not credible or truthful, the Court does not credit her testimony that neither she nor Defendant Aeva are unable to pay the Rule 37 monetary sanctions orders. For that reason, Defendants have not shown through detailed evidence why they cannot comply with those orders. *See Parker*, 468 F.3d at 740; *Wellington Precious Metals*, 950 F.2d at 1529; *Rylander*, 460 U.S. at 757; *Combs*, 785 F.2d at 983. Even if the Court had found Deinet's testimony credible, however, it still would not find that Defendants had met their high burden to make *all* reasonable efforts to satisfy the Rule 37 monetary sanctions orders — and substantial, diligent, or good faith efforts are not enough. *See Combs*, 785 F.2d at 984.

That is because, as Deinet herself admitted, the Aeva Enterprise still has some money in the bank and some assets of value. The accounts and assets she mentioned during her testimony total at least $7,000, and the Rule 37 monetary sanctions orders total $5,472.50. Beyond those holdings of specified value, Deinet admitted that the Aeva Enterprise still has product inventory and also likely owns assets she herself has lost track of (like vehicles that could be in parking lots or impound lots). The fact that the Aeva Enterprise owns sellable products and property but Defendants have not attempted to sell those assets indicates that they have not taken even minimal steps to satisfy the Rule 37 monetary sanctions orders, let alone all reasonable steps. Indeed, it appears to the Court that Defendant Deinet has done everything in her power to remain deliberately ignorant of what Defendants own and could sell to pay their debts to Plaintiff. That is the opposite of taking all reasonable steps.

In sum, the Court finds that Plaintiff has proven by clear and convincing evidence that the Court's Rule 37 monetary sanctions orders are valid, lawful, clear, and unambiguous; Defendants violated those orders; and Defendants had the ability to comply with those orders by paying the

sanctions.  *See Wellington Precious Metals, Inc.*, 950 F.2d at 1529; *Ga. Power Co.*, 484 F.3d at 1291.  The Court further finds that Defendant Deinet's testimony at the Evidentiary Hearing was not credible.  Finally, the Court finds that, even if Deinet's testimony had been truthful, Defendants have not met their high burden of showing they have taken all reasonable steps to pay the Rule 37 monetary sanctions orders.  *See Parker*, 468 F.3d at 740; *Wellington Precious Metals*, 950 F.2d at 1529; *Rylander*, 460 U.S. at 757; *Combs*, 785 F.2d at 983.   Accordingly, I respectfully **RECOMMEND** that Plaintiff's Motions for Civil Contempt against Defendants, **ECF No. [78]** and **ECF No. [79]**, be **GRANTED**.

### B.  Motion to Strike and/or Motion for Default (ECF No. [80] and ECF No. [81])

Plaintiff asks the Court to strike Defendants' Answer and enter default judgment against them because they have willfully violated the Court's discovery orders, less severe sanctions have not coerced Defendants into complying with their discovery obligations, and Defendants' noncompliance has prejudiced Plaintiff.  *See* ECF No. [44]; Fed. R. Civ. P. 37(b)(2)(A)(iii), (vi). Defendants argue that the Motion to Strike and/or Motion for Default should fail and that discovery should continue.  Once again, the Court agrees with Plaintiff.

Before the Court can impose the ultimate sanction of striking Defendants' Answer and entering default judgment against them, it must find that: (1) Defendants violated a discovery order such that Rule 37(b)(2)(A) applies and had notice that the violation may result in severe sanctions; (2) Defendants acted willfully or in bad faith; (3) Defendants' conduct prejudiced Plaintiff; (4) lesser sanctions would not be adequate; and (5) Plaintiff's complaint contains sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.  *See Telectron, Inc.*, 116 F.R.D. at 131; *Wouters*, 9 F.3d at 934; *Route 1*, 126 F.3d at 1317; *Surtain*, 789 F.3d at 1245; *Thornton v. Hosp. Mgmt. Assocs., Inc.*, 787 F. App'x 634, 639 (11th Cir. 2019); Fed. R. Civ. P.

37(b)(2)(A)(iii), (vi).  Plaintiff has met each of these elements.

First, Defendants have violated every discovery order the Court has issued.  *See* ECF No. [32]; ECF No. [38]; ECF No. [58].  At the First Discovery Hearing, the Court ordered Defendants to respond to Plaintiff's RFPs and Interrogatories and to produce better responses to Plaintiff's RFAs.  *See* ECF No. [32] at 3–7.  Defendants did not respond to Plaintiff's RFPs and Interrogatories or produce better responses to Plaintiff's RFAs, so at the Second Discovery Hearing, the Court ordered them to do so a second time.  *See* ECF No. [58] at 3–7.  And the Court has twice ordered Rule 37 monetary sanctions (totaling $5,472.50), *see* ECF No. [32] at 7–9; ECF No. [38]; ECF No. [58] at 7–9, but Defendants have paid only $400 of that amount.  Because of those orders documenting Defendants' discovery violations, Defendants have been on notice that default judgment was a possibility since Plaintiff first requested that relief in January 2025.  *See* ECF No. [39]; ECF No. [40].

Second, Defendants' violations of the Court's discovery orders were willful or in bad faith.  The Eleventh Circuit has explained that delaying or disrupting the litigation or hampering the enforcement of court orders constitutes bad faith, *see Eagle Hosp. Physicians, LLC*, 561 F.3d at 1306, and Defendants have done both here.  As thoroughly documented above, the Court has been ordering Defendants to produce discoverable information for more than six months, but they still have not given Plaintiff a complete production.  Defendants' repeated noncompliance with those orders has certainly hampered the Court's ability to enforce them through less serious means.

Defendants' recalcitrance has also caused an ongoing delay in this litigation because Plaintiff has been unable to move forward with its factfinding — by, for example, taking depositions — without the withheld discoverable information.  *See* ECF No. [49] at 2 ("Plaintiff has been unable to take Defendants' depositions because Defendants have not completed their

production of documents or adequately responded to discovery.").  That delay has even prompted Plaintiff to seek (and obtain) a stay of its own case management deadlines.  *See* ECF No. [50] at 2 ("Plaintiff's hands are tied because they have not received the discovery they need to comply with current discovery deadlines."); ECF No. [51]. The Eleventh Circuit has consistently affirmed findings of bad faith and entries of default judgment in similar situations. *See, e.g.*, *Malautea*, 987 F.2d at 1542–44; *Hornady*, 118 F.4th at 1378.

Third, Defendants' conduct has prejudiced Plaintiff.  As just described, Plaintiff has been unable gather the facts it needs to prove its case because of Defendants' failure to produce discoverable information, *see* ECF No. [49] at 2, and discovery has now closed, *see* ECF No. [12] at 2.  Without a complete production, Plaintiff was prevented from taking depositions, issuing third-party discovery, or filing dispositive motions, like a motion for summary judgment. *See* ECF No. [44] at 10.  This lawsuit is in essentially the same posture as it was in December 2024 when the Court held the First Discovery Hearing.  A more than six-month delay in the litigation process, especially in a straightforward breach of contract case like this one, is certainly prejudicial to Plaintiff.

Fourth, lesser sanctions would not be adequate.  Indeed, the Court has already imposed several other lesser sanctions as a consequence of Defendants' noncompliance with their discovery obligations — including deeming many of Plaintiff's RFAs admitted, *see* ECF No. [58] at 4–7, and ordering Defendants to pay Plaintiff's reasonable expenses for two discovery hearings, *see* ECF No. [32] at 7–9; ECF No. [38]; ECF No. [58] at 7–9 — "to no avail." *See Hornady*, 118 F.4th at 1379 ("The record shows that the district court did not abuse its discretion by deciding that no sanction short of default judgment was appropriate. In fact, lesser sanctions had already been tried — and to no avail.").  Nothing the Court has tried to date has deterred Defendants' continued

defiance of their discovery obligations.

Though Defendants eventually produced some of the discoverable information the Court ordered, "eventual production of the required discovery" does not "displace[] sanctions for earlier noncompliance." *See id.* ("That ask-for-forgiveness-rather-than-permission rule would strip sanctions of any deterrent effect — malicious actors could repeatedly violate court orders with peace of mind, knowing that any future sanction could be nullified after the fact by simple compliance with the initial order."). And even if it did, Defendants still have not produced a complete production, so forgiveness here would be unwarranted. The Eleventh Circuit has consistently affirmed district court determinations that no sanction short of default judgment was appropriate when, as here, a sanction less harsh than default judgment would not change Defendants' behavior. *See, e.g.*, *id.*

Fifth and finally, the Court must analyze whether Plaintiff's Complaint contains sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *See Thornton*, 787 F. App'x at 639 (explaining that, prior to imposing default judgment as a sanction, the district court must determine whether the complaint sufficiently states a claim for relief). As a preliminary matter, the Court notes that Defendants opted to file an Answer to the Complaint, *see* ECF No. [8], thereby waiving any argument that the allegations in the Complaint failed to state a claim for relief. *See Winslow v. Indiheartandmind, Inc.*, No. 21-CV-80800, 2021 WL 6197745, at *7 (S.D. Fla. Dec. 30, 2021) (finding that, by filing an answer to the second amended complaint, the defendants waived the ability to argue that it was deficient; therefore, the second amended complaint sufficiently stated a claim for relief for purposes of entering default judgment as a sanction for discovery violations). This alone satisfies the fifth prong of the Court's analysis.

Nonetheless, for completeness, the Court reviews the allegations of each claim to satisfy

itself that they allege sufficient factual matter to state a claim for relief. The Complaint asserts two claims: breach of contract against both Defendants and breach of guaranty agreement against Deinet only. *See* ECF No. [1] at 5–7. "For a breach of contract claim, Florida law requires the plaintiff to plead and establish: (1) the existence of a contract; (2) a material breach of that contract; and (3) damages resulting from the breach." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009); *see also Isaac Indus., Inc. v. Petroquimica de Venezuela, S.A.*, 676 F. Supp. 3d 1227, 1232 (S.D. Fla. 2023); *Friedman v. N.Y. Life Ins. Co.*, 985 So. 2d 56, 58 (Fla. 4th DCA 2008). "To prove the existence of a contract, a plaintiff must plead: (1) offer; (2) acceptance; (3) consideration; and (4) sufficient specification of the essential terms." *Vega*, 564 F.3d at 1272; *see also St. Joe Corp. v. McIver*, 875 So. 2d 375, 381 (Fla. 2004).

Plaintiff alleges that, in May 2024, Plaintiff and Defendant Aeva entered into "a future receivables sale and purchase agreement" for "business financing." *See* ECF No. [1] at 2. The signed and executed Agreement is attached to the Complaint. *See* ECF No. [1-2]. The Complaint further alleges, and the Agreement itself confirms, that Plaintiff paid $150,000 to Aeva in exchange for a later payment of $204,000 from Aeva, which Plaintiff would receive as a specific percentage of Aeva's "future receipts." *See* ECF No. [1] at 2; ECF No. [1-2] at 1. And the Complaint alleges the essential terms of the Agreement, which include that Aeva would repay the business loan by "depositing 6% of its daily" future receipts "into a designated deposit account, from which Plaintiff" was "authorized to ACH debit a weekly payment" of $5,100 until Plaintiff recovered the full $204,000 it was owed. *See* ECF No. [1] at 2–3; ECF No. [1-2] at 1–2.

The Complaint also alleges that Defendant Deinet signed a "Personal Guaranty of Performance" through which she "irrevocably, absolutely and unconditionally guarantee[d]" to Plaintiff the "prompt and complete performance of all" Aeva's "obligations" under the Agreement.

*See* ECF No. [1-2] at 17–20; ECF No. [1] at 3–4.  The signed and executed Guaranty Agreement is attached to the Complaint.  *See* ECF No. [1-2] at 17–20.  And as with the Agreement, the Complaint alleges the essential elements of the Guaranty Agreement, *see* ECF No. [1] at 3–4, which include that Deinet "unconditionally covenant[ed]" to Plaintiff "in the event of a default or breach at any time by" Aeva that she would "be responsible for" the terms of the Agreement "and pay all damages and other amounts stipulated in the Agreement."  *See* ECF No. [1-2] at 17.  Those allegations, along with the attached Agreement and Guaranty Agreement, are sufficient under Florida law to establish the existence of those contracts.  *See Vega*, 564 F.3d at 1272; *McIver*, 875 So. 2d at 381; *Surtain*, 789 F.3d at 1245; *Saunders*, 766 F.3d at 1270.

The Complaint also adequately alleges a breach of those contracts.  It alleges that, as of October 2024, there had "been two or more ACH transactions attempted by" Plaintiff "that were rejected by" Aeva's bank.  *See* ECF No. [1] at 4.  It also alleges that Aeva "used multiple depository accounts without obtaining prior written consent" from Plaintiff; "failed to deposit all of its Future Receipts into the Approved Bank Account"; "changed the Approved Bank Account or Approved Processor without obtaining prior written consent of" Plaintiff; "interfered with" Plaintiff's "collection of the" amounts it was due, including by interfering with ACH payments; and "breached one or more representations and warranties made to" Plaintiff.  *See* ECF No. [1] at 4.  As to the Guaranty Agreement, the Complaint alleges that Plaintiff "delivered to" Defendants a "notice of default" in September 2024 but that Deinet "failed to correct or cure" Aeva's "defaults" as she was required to do "under the Guaranty Agreement."  *See* ECF No. [1] at 4.  Those allegations are sufficient under Florida law to establish the breach of those contracts.  *See Vega*, 564 F.3d at 1272; *Isaac Indus., Inc.*, 676 F. Supp. 3d at 1232; *Friedman*, 985 So. 2d at 58; *Surtain*, 789 F.3d at 1245.

Finally, the Complaint adequately alleges damages stemming from Defendants' breach of the Agreement and the Guaranty Agreement.  It alleges that, as of October 2024, the "unpaid portion of the" amount Defendants owe Plaintiff was "$153,000."  *See* ECF No. [1] at 5.  It alleges that "[p]ursuant to the Agreement," Plaintiff "is also entitled to additional fees in the amount of $43,425."  *See* ECF No. [1] at 5.  And it alleges that Plaintiff "is entitled to recover its attorneys' fees and costs should it prevail in this action pursuant to the terms of the Agreement."  *See* ECF No. [1] at 5.  Those allegations are sufficient under Florida law to establish damages stemming from Defendants' breach of the Agreement and the Guaranty Agreement.  *See Vega*, 564 F.3d at 1272; *Isaac Indus., Inc.*, 676 F. Supp. 3d at 1232; *Friedman*, 985 So. 2d at 58; *Surtain*, 789 F.3d at 1245.

In sum, the Court finds that Plaintiff has adequately pleaded the existence of the Agreement and the Guaranty Agreement, the breach of those contracts, and damages flowing from that breach.  As a result, the Complaint contains sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face because it contains factual content that allows the Court to draw the reasonable inference that Defendants are liable for the misconduct alleged.  *See Surtain*, 789 F.3d at 1245; *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 570.  Because Plaintiff's allegations could "survive a motion to dismiss for failure to state a claim," default judgment is appropriate.  *See Surtain*, 789 F.3d at 1245; *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 570; *Thornton*, 787 F. App'x at 639.

Accordingly, I respectfully **RECOMMEND** that Plaintiff's Motion to Strike and/or Motion for Default against Defendants, **ECF No. [80]** and **ECF No. [81]**, be **GRANTED**.

## IV.   CONCLUSION

For the reasons explained above, I respectfully **RECOMMEND** that**:**

1. Plaintiff's Motion for Civil Contempt against Defendant Aeva, **ECF No. [78]**, be **GRANTED** as follows:

   a. Defendant Aeva be **HELD** in civil contempt for failure to pay the full $2,557.50 monetary sanctions award entered on January 23, 2025, *see* ECF No. [38], and the full $2,915 monetary sanctions award entered on February 19, 2025, *see* ECF No. [58].

   b. **Within seven days of Judge Bloom's final order on this R&R,** Defendant Aeva be **ORDERED** to pay the remaining unpaid amount of the total $5,472.50 monetary sanctions awards entered against it[15] and be **ASSESSED** a coercive fine of $500 per day if it fails to fully and timely complete that payment.

2. Plaintiff's Motion for Civil Contempt against Defendant Deinet, **ECF No. [79]**, be **GRANTED** as follows**:**

   a. Defendant Deinet be **HELD** in civil contempt for failure to pay the full $2,915 monetary sanctions award entered on February 19, 2025, *see* ECF No. [58].

   b. **Within seven days of Judge Bloom's final order on this R&R,** Defendant Deinet be **ORDERED** to pay the remaining unpaid amount of the $2,915 monetary sanctions award entered against her and be **ASSESSED** a coercive fine of $500 per day if she fails to fully and timely complete that payment.

3. Plaintiff's Motion to Strike and/or Motion for Default against Defendant Aeva, **ECF No. [80]**, be **GRANTED.**

4. Plaintiff's Motion to Strike and/or Motion for Default against Defendant Deinet, **ECF No. [81]**, be **GRANTED.**

---

[15] As of the date of the Evidentiary Hearing, Defendants had paid only $400 in total to satisfy the two sanctions awards.

CASE NO. 24-CV-23649-BLOOM/Elfenbein

5.  Defendants' Answer, **ECF No. [8]**, be **STRICKEN** under Rule 37(b)(2)(A)(iii) and **DEFAULT JUDGMENT** be **ENTERED** against them under Rule 37(b)(2)(A)(vi).

6.  Plaintiff be **ORDERED** to file a supplemental brief regarding the amount of damages that should be awarded against Defendants pursuant to the default judgment.

Pursuant to Local Magistrate Rule 4(b), the parties have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Beth Bloom, United States District Judge.  Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice.  *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.

**DONE AND ORDERED** in Chambers in Miami, Florida on May 27, 2025.

**MARTY FULGUEIRA ELFENBEIN**
**UNITED STATES MAGISTRATE JUDGE**

cc: All counsel of record

41